ACCEPTED
06-14-00157-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
3/11/2015 12:02:30 PM
DEBBIE AUTREY
CLERK

## NO. 06-14-00157-CR

IN THE COURT OF APPEALS
FOR THE
SIXTH APPELLATE DISTRICT OF TEXAS
AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
3/11/2015 12:02:30 PM
DEBBIE AUTREY
Clerk

## CINQUE ROSS

### vs.

## THE STATE OF TEXAS

Appealed from the 188th District Court of Gregg County, Texas
Trial Cause No. 43,104-A

## BRIEF FOR APPELLANT CINQUE ROSS

LAW OFFICES OF HOUGH-LEWIS ("LEW") DUNN
201 E. Methvin, Suite 102
P. O. Box 2226
Longview, TX 75606
Texas State Bar No. 06244600
Email: dunn@texramp.net
Tel: 903-757-6711
Fax: 903-757-6711
Counsel for Appellant

*Appellant Respectfully Requests Oral Argument.*

## STATEMENT REGARDING PARTIES TO THIS APPEAL
[RULE 38.1(a) TEX.R.APP. PROC.]

CINQUE ROSS
Appellant

Rick Hagan
Attorney at Law
Trial Counsel for Appellant
Texas State Bar No. 00786430
P.O. Box 3347
Longview, TX 75606

Tanya Reed
Texas State Bar No. 24039204
Assistant Criminal District Attorney
Counsel for the State at Pre-Trial
Debbie Garrett
Texas State Bar No. 00790747
Assistant Criminal District Attorney
Counsel for the State at Trial
101 E. Methvin Street, Suite 333
Longview, TX 75601

Hough-Lewis ("Lew") Dunn
Attorney at Law
Counsel for Appellant on Appeal
Texas State Bar No. 06244600
P.O. Box 2226
Longview, TX 75606

Zan Colson Brown
Texas State Bar No. 03205900
Assistant Criminal District Attorney
Counsel for the State on Appeal
101 E. Methvin Street, Suite 333
Longview, TX 75601

TABLE OF CONTENTS

PAGE

STATEMENT REGARDING PARTIES TO THIS APPEAL ….. ii

TABLE OF CONTENTS ……………………………………… iii

TABLE OF AUTHORITIES ……………………………………. vi

ISSUES PRESENTED ……………………………………. ix

STATEMENT OF FACTS ……………………………………... 2

THE JURY WAIVER ON FEBRUARY 14, 2014 ………………. 2

HEARING FEBRUARY 20, 2014 ………………………………… 3

HEARING MARCH 7, 2014 ……………………………………….. 3

BENCH TRIAL JULY 9, 2014 ………………………………….. 4

     Raven Lister …………………………………………….. 5

     Joey Chitwood ………………………………………….. 5

     Appellant Cinque Abjual Ross ……………………………… 10

MOTION FOR NEW TRIAL OCTOBER 18, 2014 …………….. 13

SUMMARY OF THE ARGUMENT …………………………… 15

ARGUMENT AND AUTHORITIES …………………………… 15

# TABLE OF CONTENTS (CONT'D)

PAGE

FIRST ISSUE, RESTATED ……………………………………….. 15

THE TRIAL COURT REVERSIBLY ERRED IN FAILING
TO PERMIT APPELLANT TO WITHDRAW HIS WAIVER
OF JURY TRIAL

      FACTS …………………………………………………. 15

      LAW AND ANALYSIS ……………………………….. 17

SECOND ISSUE, RESTATED ………………………………. 20

THE VIDEO OF THE CUSTODIAL INTERROGATION AND ITS
EVIDENCE SHOULD HAVE BEEN SUPPRESSED, SINCE IT
WAS BASED UPON AN ILLEGAL INDUCEMENT BY AGENTS
OF THE STATE, AND, CONSEQUENTLY, MAKING IT
INVOLUNTARY

      FACTS …………………………………………………. 20

      LAW AND ANALYSIS ………………………………. 21

THIRD ISSUE, RESTATED …………………………………. 25

THE TRIAL COURT REVERSIBLY ERRED IN FINDING THE
SEARCH WARRANT VALID AND, THEREBY, ADMITTING
THE EVIDENCE TAKEN DURING THE SEARCH

      FACTS …………………………………………………. 25

      LAW AND ANALYSIS ………………………………. 27

# TABLE OF CONTENTS (CONT'D)

PAGE

FOURTH ISSUE, RESTATED ……………………………….    28

SEC. 46.04(a)(1), TEX. PENAL CODE, AS APPLIED TO
APPELLANT IS UNCONSTITUTIONAL, SINCE UNDER THE
SECOND AMENDMENT, U.S. CONST., IT IS A
CONSTITUTIONALLY PROTECTED RIGHT FOR AN
INDIVIDUAL TO POSSESS A FIREARM IN HIS HOME FOR
THE PURPOSES OF SELF-DEFENSE

    FACTS ………………………………………………….    28

    LAW AND ANALYSIS …………………………………    28

PRAYER FOR RELIEF ……………………………………    32

CERTIFICATE OF DELIVERY …………………………..    33

CERTIFICATE OF COMPLIANCE ……………………..    33

# TABLE OF AUTHORITIES

CASES                                                                      PAGE

*Blake v. State*, 125 S.W.3d 717 ……………………………… 27
    (Tex. App. – Houston [1st Dist.] 2003 no pet.)

*Creager v. State*, 952 S.W.2d 852 (Tex. Crim. App. 1997) ……….. 22

*District of Columbia v. Heller*, 554 U.S. 570 (2008)……………….. 29

*Hobbs v. State*, 298 S.W.3d 193 (Tex. Crim. App. 2009) ………… 17

*Holmes v. State*, 323 S.W.3d 163 (Tex. Crim. App. 2010)……….. 24

*McDonald v. Chicago*, 561 U.S. 742 (2010) ………………… 28, 29, 30, 31

*McGrew v. State*, 286 S.W.3d 387 ……………………………….. 20
    (Tex. App. – Corpus Christi 2008, no pet.)

*Miranda v. Arizona*, 384 U.S. 436 (1966) ……………………….. 21, 22, 23

*Rios v. State*, 901 S.W.2d 704 …………………………………… 27
    (Tex. App. – San Antonio 1995, no pet.)

*Sax v. Votteler*, 648 S.W.2d 661 (Tex. 1983) …………………… 29

*Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698 (Tex. 2014) ………. 29

*Vasquez v. State*, 830 S.W.2d 948 (Tex. Crim. App. 1992) ………. 30

*Williams v. Glash*, 789 S.W.2d 261 (Tex. 1990) …………………. 18

*Wolfe v. State*, 917 S.W.2d 270 (Tex. Crim. App. 1996) …………. 22

# TABLE OF AUTHORITIES (CONT'D)

STATUTES AND RULES                                          PAGE

U.S.CONST.

Second Amendment ……………………………………          28, 29, 30, 31

Fourth Amendment …………………………………….          27

Fifth Amendment ……………………………………          21

Sixth Amendment …………………………………..          17

Fourteenth Amendment …………………………………..          28

TEXAS CONST.

Art. 1, Sec. 9 …………………………………………          27, 28

Art. 1, Sec. 10 …………………………………………          17

TEX. CODE CRIM. PRO.

Art. 1.06 …………………………………………….          27

Art. 1.12 …………………………………………          17

Art. 1.13 …………………………………………          17

Art. 18.01 …………………………………………..          27

Art. 18.04(2) …………………………………………..          27

Art. 38.22 …………………………………………..          22

# TABLE OF AUTHORITIES (CONT'D)

STATUTES AND RULES                                    PAGE

TEX. CODE CRIM. PRO.

Art. 38.22, Sec. 3(a) …………………………………………..        22

Art. 38.23 …………………………………………………………        28

TEX. PENAL CODE

Sec. 46.04(a)(1) ………………………………………………….        28, 29

Sec. 46.04(a)(2) …………………………………………………..        30

TEX. R. APP. PRO.

Rule 38.1(a) …………………………………………………………..        ii

Rule 44.2(a) ……………………………………………………….        24

OTHER SOURCES

Vernon's Texas Codes Annotated, Penal Code, Vol. 6 ……………… 30

Texas Legislative Reference Library, www.lrl.tx.us ……………… 30

NOTE: All references to statutes and rules are to the relevant dates found in Vernon's Texas Codes Annotated

ISSUES PRESENTED

FIRST ISSUE:

THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO PERMIT APPELLANT TO WITHDRAW HIS WAIVER OF JURY TRIAL

SECOND ISSUE:

THE VIDEO OF THE CUSTODIAL INTERROGATION AND ITS EVIDENCE SHOULD HAVE BEEN SUPPRESSED, SINCE IT WAS BASED UPON AN ILLEGAL INDUCEMENT BY AGENTS OF THE STATE, AND, CONSEQUENTLY, MAKING IT INVOLUNTARY

THIRD ISSUE:

THE TRIAL COURT REVERSIBLY ERRED IN FINDING THE SEARCH WARRANT VALID AND, THEREBY, ADMITTING THE EVIDENCE TAKEN DURING THE SEARCH

FOURTH ISSUE:

SEC. 46.04(a)(1), TEX. PENAL CODE, AS APPLIED TO APPELLANT IS UNCONSTITUTIONAL, SINCE, UNDER THE SECOND AMENDMENT, U.S. CONST., IT IS A CONSTITUTIONALLY PROTECTED RIGHT FOR AN INDIVIDUAL TO POSSESS A FIREARM IN HIS HOME FOR THE PURPOSES OF SELF-DEFENSE

NO. 06-14-00157-CR

IN THE COURT OF APPEALS
FOR THE
SIXTH APPELLATE DISTRICT OF TEXAS
AT TEXARKANA

**CINQUE ROSS**

**vs.**

**THE STATE OF TEXAS**

Appealed from the 188th District Court of Gregg County, Texas
Trial Cause No. 43,104-A

**BRIEF FOR APPELLANT CINQUE ROSS**

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

COMES NOW CINQUE ROSS, Appellant herein, on appeal in Cause No. 43,104-A, and the "Judgment of Conviction" of the District Court for 188th Judicial District Court of Gregg County, Texas, wherein he was found guilty of felon in possession of a firearm, and sentenced to a term of eight (8) years in the Texas Department of Criminal Justice, Institutional Division, the Honorable David Brabham presiding at the time of a bench trial without a jury, in which Appellant was Defendant, and in which the State of Texas was

1

plaintiff and now Appellee, and makes this, his appeal to this Honorable Court.

## STATEMENT OF FACTS

<u>THE JURY WAIVER ON FEBRUARY 14, 2014</u>

On February 14, 2014, Appellant and his counsel appeared before the Trial Court for the purposes of clarifying a plea agreement (2 RR 4). There were two cases before the court: this case and Cause No. 43,451-A, an information alleging possession of a controlled substance. The agreement was for Appellant to plead guilty to the felony information, get a six (6) year sentence, and the case of felon in possession of a firearm would be dismissed as well as a charge of possession of a prohibited substance in a correctional facility (2 RR 4-5). At first Appellant seemed to reject the offer, conferring with counsel during a recess (2 RR 5-8). Then he came back before the Court and stated that he would take the offer ( 2 RR 9-10).

As a part of the plea agreement, Appellant signed a waiver of jury trial in both cases (2 RR 10-11; CR 21). The Court told Appellant that, if he approved the jury waivers in both cases, he could never again come back and ask for a jury trial (2 RR 12). Counsel confirmed to the Court that Appellant understood "the implications of the jury waivers" (2 RR 12). A date was then set to return for the plea on February 20, 2014 (2 RR 13). This was to enter a plea to the possession of a controlled substance (2 RR 13).

2

HEARING FEBRUARY 20, 2014

On February 20, 2014, Appellant appeared with counsel and told the Court that he and his family were trying to hire retained counsel. Therefore, the scheduled plea was cancelled; Appellant had changed his mind about that plea and wanted now to go to trial on the "indicted case," i.e., the felon in possession of a firearm case. The plea was cancelled (3 RR 4).

HEARING MARCH 7, 2014

On March 7, 2014, Appellant appeared with counsel, presumably for a guilty plea to the felony information of possession of a controlled substance (4 RR 4). However, since the last court appearance, the lab report had come back; the amount of controlled substance was less than one gram, and was, therefore, not a felony amount; the State could not proceed on its pleadings (4 RR 4). The State was now offering a term of five (5) years TDCJ in return for a plea of guilty, which Appellant rejected (4 RR 5). The issue of Appellant's knowing and intelligent and voluntary waiver of a jury trial in the weapons case now was raised; "he believes he was confused when he waived the jury, that he did not understand what he was doing when he waived the jury" (4 RR 5). Counsel for Appellant stated: "We're either ready to go forward on the weapons without a plea agreement to the Court or the Court rescinds the jury waiver , then I guess it would be set and we'll be ready for a jury trial" (4 RR 5). The State believed that the jury waiver should be upheld by the Court, resulting in a bench trial

3

(4 RR 6). As to the possession of drugs charge, the Trial Court stated: "although he did waive jury, that was on an information so he's got a right to a jury on the possession, on the drug case" (4 RR 6). But the State maintained that both cases would be bench trials (4 RR 7).

Coming back to Appellant, he stated that he did not understand, saying, "I was unaware of that, though." And counsel told him: "…you waived the jury…without the benefit of a plea agreement" (4 RR 8). Appellant persisted and stated: "I was unaware of that, Your Honor. That's what – I didn't know what I was signing. I was in emotional distress at the time." He wondered if the Court found him "incompetent at the time"; but the Court said, "No. That you knew what you were doing, that you waived the jury…" (4 RR 8). The Court found that the jury waiver remained in place for the weapons case (4 RR 9).

BENCH TRIAL JULY 9, 2014

The case was called for trial on July 9, 2014. Although the State announced "ready," Appellant stated he was not ready, that his mother and family were hiring other counsel -- " a new lawyer" – that he had been "misrepresented," since his brother was "coming up here to sign a non-prosecution affidavit indicating the guns was theirs" (sic) (5 RR 4-5). The Court denied the request that the case be delayed and believed that current counsel "will do you an excellent job" (5 RR 9).

4

Appellant's counsel was ready subject to a motion to suppress statements, the video, the search warrant, which would be taken up as the trial progressed (5 RR 10).

Thereafter the indictment was read and a "not guilty" plea was entered (5 RR 10-11). Witnesses were sworn, the Rule was invoked, and opening statements were made (5 RR 12-13).

Raven Lister

Ms. Lister stated that she was a parole officer, had worked at that position for six years, and knew Appellant (5 RR 14-15). She supervised Appellant's parole for assault on a public servant in Cause No. 33,698-A from Gregg County; she did not know the date of the conviction (5 RR 15). She identified Appellant in open court (5 RR 16). Appellant had been released from supervision on April 1, 2011 (5 RR 16).

Joey Chitwood

Officer Chitwood worked for the Kilgore Police Department, assigned to the narcotics unit, also called the "C.OD.E." unit (5 RR 17). After testifying to his employment, credentials and training, Officer Chitwood stated that he prepared an affidavit for a search warrant on September 18, 2013, based upon information from a confidential informant; the affidavit was presented to Judge Brabham, who reviewed it and signed a search warrant (5 RR 19-20).

State's Exhibit No. 2 was then marked; Officer Chitwood was then questioned about it (5 RR 19-20). The State then offered the Search Warrant into evidence, but

counsel for Appellant objected, saying that "it does not particularly describe the property of the person to be searched. It is stale – it also does not set forth probable cause in the four corners of the document" (5 RR 21). The Trial Court carried along the objection, but received the exhibit so that he could review it as the trial went along (5 RR 21).

Officer Chitwood then took the search warrant to a briefing with the SWAT team, had a briefing, then went out to 405 Harris Street in Kilgore, Gregg County (5 RR 21-23). Appellant was named in the warrant; he was identified in open court (5 RR 22). The SWAT team went into the residence while Chitwood waited across the street. Once the location was secured, he entered the residence (5 RR 23). Four persons were there: Jason Coggins was in the front living room; Steven Cantrell was in the living room; Mildred Ross was in the area between the kitchen and living room, and Appellant was in the first bedroom on the left, "a blue in color bedroom" (5 RR 24).

It was in that bedroom that agents found "all the narcotics and the handguns" (5 RR 25). Over Appellant's objection State's Exhibits 3 and 4 were admitted into evidence: photographs from the scene of the search in the "blue" bedroom (5 RR 25). The witness stated that he anticipated finding handguns in that room, based upon the information from the informant (5 RR 26). Officer Chitwood said he found several small baggies of methamphetamine scattered throughout on the floor; then he found

four handguns inside the closet: a Glock 27 .40-caliber lying on top of some Jordan tennis shoes; a .380 in the left shoe; a .38 Special in the right shoe; a .22 in the pocket of a FUBU jacket in the closet; ammunition was found on top of the dresser. At that site he also found mail that belonged to Appellant, and "a little bit of marijuana" (5 RR 26-27).

Thereafter, the State showed Officer Chitwood a series of photographs from the scene of the various objects about which he had just testified: Exhibits 5-19 (5 RR 27-28). Counsel for Appellant objected to their admission, referring to his objections to the search warrant (5 RR 28-29). The Trial Court overruled those objections and received the exhibits into evidence (5 RR 29). Then Officer Chitwood identified another set of exhibits (State's Exhibits 20-24) as pictures of pieces of mail addressed to Appellant (address: 405 Harris, Kilgore), which were found in the bedroom (5 RR 29-30). Appellant's counsel made his same objections to those exhibits, and the objections were overruled, bringing the exhibits into evidence (5 RR 30).

Subsequent to that, the State next offered Exhibit 25, the .38 Special pistol; State's 26, the firearm located on top of the shoes [Glock 27 .40-caliber]; State's 27, .22 pistol; State's 28, the .380 pistol. To all of these Appellant's counsel raised the same objections and was overruled; the four weapons were received into evidence (5 RR 30-34). In clarification, Appellant's counsel stated: "And just to make sure I'm clear on the record, the objections that I'm saying same objection to are to the warrant,

7

the search, and any evidence that was recovered from it"; to this the Trial Court replied: "Well, I'm going to receive the evidence subject to my ruling on your overall objection as to the search warrant." (5 RR 34)

Then there was this exchange between Appellant's counsel and the Trial Court:

Counsel:    Right. Oh, okay. Thank you. I just didn't know if you had ruled on that or not yet, and if you had I just need – there is another objection I need to make after that to the Court.

Court:    Well, I've reviewed the search warrant, so I'm prepared to overruled your objection as to the search warrant at this time.

Counsel:    Judge, I need to, for the record, object to the introduction of all the evidence that's come in so far and further on to the prosecution of it under the Second Amendment to the Constitution, specifically that Penal Code Section 46.04(a) is an unreasonable restraint on the defendant's right to keep and bear arms that has just come out within the past year or so by the Supreme Court that it's a personal right. And we submit that weapons inside the defendant's home is an unreasonable – or barring weapons inside the defendant's home is an unreasonable restraint on the Second Amendment right. We'd object to it.

Court:    Overruled.

(5 RR 34-35).

The State continued its evidence, showing Officer Chitwood State's Exhibit 29, identified as a box of .40 caliber ammunition, found in the bottom drawer of the night stand (5 RR 36-37). Then State's Exhibits 30 and 31: loose ammunition from locations seen in the pictures. State's Exhibits 29-31 were offered; Appellant's counsel made the same objection, which was overruled, and those exhibits were received into evidence. (5 RR 36).

A few days later, on September 20, 2013, after he was arrested and taken to jail, Appellant was subjected to custodial interrogation by Officer Chitwood; the Miranda warnings were read and signed by Appellant, as evidenced in State's Exhibit 32 (5 RR 37-38), received without objection. Then the State offered State's Exhibit 33, a video interview of Appellant; to this Appellant objected (5 RR 39). During the time it took to get the video apparatus set up to play the video, Appellant informed the Trial Court that he would stipulate to State's Exhibit 1, the prior felony conviction , and such was noted in the record (5 RR 39-40) with the exhibit received into evidence. Then State's exhibit 33 was played, the interview between Appellant and Officer Chitwood (5 RR 40). At the time of the offense, Appellant was off parole (5 RR 41); someone else put the firearms in Appellant's closet, though he knows they are there; his fingerprints are on the weapons, and the location was his bedroom (5 RR 41-42). Appellant said that he placed the weapons in a plastic bag, in a backpack, and would walk with them to sell them (5 RR 42).

On cross-examination Officer Chitwood denied that Appellant had spoken to him at the time of arrest or mentioned that he wanted to talk with him or help him or work with him (5 RR 44). After Appellant had been in jail a while Officer Chitwood stated that he learned that Appellant wanted "to work", i.e. be an informant (5 RR 45). However, Officer Chitwood and his unit and supervisor felt that the people Appellant mentioned already had informants working them; however, once Appellant got out on bond, Officer Chitwood said they tried to work with him, but it did not work out. He cited that fact that Appellant gave them "high hopes" but that Appellant would not report or contact them, or if he did, it was in a tardy manner (5 RR 45-46). Officer Chitwood framed this as being a part of what he called "work their charge off" (5 RR 46). When asked if he was not going to try to help Appellant get his bond reduced in return for his cooperation, Officer Chitwood did not deny that statement, but said that after evaluating the information given to them by Appellant, he did not think it would be worth getting the $70,000 bond reduced (5 RR 47).

After the State rested its case (5 RR 49), Appellant took the stand in his own defense.

Appellant Cinque Abjual Ross

Appellant told the Court that he had been advised of his right to testify or not, and decided that he would do so, because "I just want to be honest with him, you know, about my situation and the whole courts and everything" (5 RR 50).

10

Appellant stated that no one from law enforcement ever showed him or his mother the search warrant that day (5 RR 51). A few days after his arrest, Appellant decided that he would try to work with Officer Chitwood, that "…maybe I could – they could help me or we could help each other" (5 RR 52). According to Appellant, Officer Chitwood stated that, if he would "admit to the guns that he could help me. That's the only reason why I admitted to the guns" (5 RR 52).

Others shared the bedroom with Appellant: his nephew LaBryson Orange, and his son Jacobe Ross. He was unaware that the guns were there until officers "kicked the door in and put guns in my mom's face and my little brother's face and my nephew" (5 RR 52). Once Appellant bonded out of jail in September, he spoke to Officer Chitwood, who came to his house, and gave him some names – persons he had encountered while in jail: Christopher Stubbs and Rashunda Butler (5 RR 53). He also gave information to Detectives Lennox and Hope about someone named Bryan Butler, and he also told Officer Chitwood that he would wear a wire to help him (5 RR 54). However, Appellant stated that Officer Chitwood jeopardized him and his family when he came to his house after release from jail;   Appellant had concerns that the people whose names he had given (like Bryan Burns) and drug dealers at the end of his street (Mike Wilson and Michael Dennis) might retaliate (5 RR 54-55; 66). Appellant stated: since day one of arrest he had been trying to cooperate with police, because he was told that if he helped them, that they would help him (5 RR 55-56).

Once he was bonded out, he had to be concerned – while assisting the police – for his and his family's safety (5 RR 56).

As to punishment, Appellant stated that if found guilty, he hoped that the Court would be lenient, taking into consideration that he had been working with law enforcement, with rehab and probation (5 RR 57). He wanted to remain out of prison so he could be available for his son, to keep his son from going down the same road (5 RR 57).

In cross-examination Appellant stated that before the custodial interview began and before Miranda rights were given, there was a conversation between him and Officer Chitwood, where Chitwood said, "Well, we know your fingerprints are on there [the pistols] so you might as well admit to it." (5 RR 59-60). That was the context for why, on the video, he states that his fingerprints will be on the guns (5 RR 60).

On re-direct, Appellant confirmed that this was the context for the remark about fingerprints on the pistols (5 RR 64-65). Before the video, Officer Chitwood told Appellant: "Now if you admit to this, that's the only way I can help you" (5 RR 65). This occurred before the officers brought in the Miranda warnings and administered them (5 RFR 65).

After Appellant rested his evidence, both sides rested and closed (5 RR 66). Argument ensued (5 RR 67-68). The State argued that the evidence proved the

allegations (5 RR 67). Counsel for Appellant argued that the statement given by Appellant was the product of promises from law enforcement – the "type of promise that would induce someone to give a false confession" and that the confession was, therefore, not voluntary. Counsel also re-urged his objections and argued for an acquittal (5 RR 67-68). The Court found Appellant guilty as charged (5 RR 68).

The punishment phase commenced, with the State offering State's Exhibits 34-43: prior convictions; with no objection from Appellant, the exhibits were received, and the State rested (5 RR 69). Appellant requested a pre-sentencing assessment on drug dependency, and the punishment phase was re-set for that to be done (5 RR 69-70). Post-conviction bail was then set at $50,000 (5 RR 70). Punishment hearing was continued to August 4, 2014 (5 RR 71).

When the punishment phase reconvened on August 4, 2014, the Court stated that the pre-sentence report had been prepared, that he had seen it and read it (6 RR 4). With that, both sides rested and closed evidence (6 RR 5). After hearing arguments on punishment, the Court assessed punishments at eight (8) years confinement in TDCJ, with credit for time served (6 RR 9, CR 29).

MOTION FOR NEW TRIAL OCTOBER 18, 2014

On October 18, 2014, Appellant presented a Motion for New Trial (7 RR 4 ff). As a part of that hearing, counsel or the State informed the Court how, in another case involving Appellant, a lab report came back showing that the amount of controlled

13

substance was less than the minimum needed to support an indictment, thus "…there was no way for him to plead to the possession of controlled substance information of what we thought was one gram to four grams" (7 RR 6). State's counsel then related the events (*see,* Brief, above, pp. 3-4) at the hearing on March 7. The dates of when that information became known to Appellant and his counsel were placed before the Court: the officer's initial report on the drug offense recited an amount over 1 gram (7 RR 7, line 22 through page 8, line 15), with State's counsel saying about the assumption that there was an amount of over 1 gram: "That was the basis of our agreement was that it came in at one to four grams, a third-degree felony, so we did an information based on that information" (7 RR 8). State's counsel also told the Court that even though the lab report was received in the prosecutor's office on January 15, it was only on February 26 when she received the lab report (7 RR 6-7). Thus, the State was not actually aware of that lab report until everyone one had come to court on February 14, the date when the waiver of jury trial was signed and approved by the Court (7 RR 8). Those facts were agreed upon by the parties at the hearing on the Motion for New Trial (7 RR 9). After argument of counsel, the Court denied the Motion for New Trial (7 RR 25). Thereafter, this appeal comes forward for review by tis Honorable Court.

## SUMMARY OF THE ARGUMENT

THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO SET ASIDE THE WAIVER OF JURY TRIAL, SINCE IT WAS MADE INVOLUNTARILY AND WITHOUT KNOWLEDGE OF FACTS UNDERLYING ITS EXECUTION. THE CUSTODIAL INTERROGATION OF APPELLANT SHOULD HAVE BEEN SUPPRESSED, SINCE IT WAS MADE UNDER INDUCEMENTS AND FALSE PROMISES FROM LAW ENFORCEMENT, MAKING IT UNRELIABLE. THE SEARCH WARRANT WAS DEFECTIVE, AND THE EVIDENCE DERIVED THEREFORE SHOULD HAVE BEEN SUPPRESSED, BECAUSE THE INFORMATION CONTAINED WITHIN ITS FOUR CORNERS WAS CONCLUSORY AND NOT SUFFICIENT TO PROVIDE PROBABLE CAUSE. THE TRIAL COURT ERRED IN FAILING TO FIND THE STATUTE UNCONSTITUTIONAL, SINCE IT CONFLICTS WITH THE SECOND AMENDMENT RIGHT OF A PRIVATE CITIZEN TO KEEP ARMS IN HIS OWN HOME.

## ARGUMENT AND AUTHORITIES

### FIRST ISSUE, RESTATED

**THE TRIAL COURT REVERSIBLY ERRED IN FAILING TO PERMIT APPELLANT TO WITHDRAW HIS WAIVER OF JURY TRIAL**

FACTS

The evidence shows that Appellant, at the time he executed his waiver of jury trial in this case, was charged under two different instruments: an indictment in the instant case and an information alleging possession of a controlled substance (PCS) in an amount of more than one gram but less than four grams, a third degree felony (2 RR 4). In fact, the caption for the Reporter's Record for February 14, 2014 (Vol. 2 of the RR), indicates both cause numbers: 43,104-A, and 43,451-A (2 RR 1). When the parties appeared on February 14, the case they intended to proceed with a guilty plea

on was the PSC case – with an offer of six years -- , and that the case for felon in possession of a firearm would be dismissed, along with a fail to ID misdemeanor and other drug offenses (2 RR 4-5). This was stated by both the prosecutor and Appellant's counsel (2 RR 5). At first Appellant stated that he rejected the plea agreement (2 RR 6-7), but after conferring with counsel, he later told the Court that he did accept the offer and the agreement (2 RR 10-12).

However, as shown in the record from the hearing on March 7, and according to the facts as related by State's counsel at the hearing on the Motion for New Trial, the state of knowledge of both the parties at the hearing on February 14, 2014, was flawed and based upon a false assumption that can be traced back to an initial law enforcement report that believed there was an amount over one gram. The assumption was that the amount of controlled substance was sufficient to support the allegation and proof of a third degree felony. Although the lab report reflecting an amount less than one gram had been received into the prosecutor's offices on January 15, 2014, the prosecutor (and by extension, Appellant and his counsel) only became aware of the report on February 26, eleven days after the hearing where the right to a jury trial was waived. Added to this, once Appellant sought to retract his waiver of jury trial, the record contained no evidence concerning how such a retraction and reinstatement of the right to jury trial would affect the administration of justice in the trial court, impact the State's witnesses, or otherwise prejudice the State. No evidence exists that

might support a negative impact on the court and its duties or the prosecution in putting on its case. See, 4 RR, *passim*.

LAW AND ANALYIS

The right to a jury trial rests in the Sixth Amendment to the U.S. Constitution and its state counterpart in Art. 1, Sec. 10, TEX. CONST.; *see*, Art. 1.12, TEX. CODE CRIM. PRO. However, the accused may waive his right to a jury trial. *See*, Art. 1.13, TEX. CODE CRIM. PRO., so long as the requirements of the statute are met. However, it has also been stated that once a defendant waives his right to a jury trial, he does not have the "unfettered right to reassert that right" *Hobbs v. State*, 298 S.W.3d 193, 197-198 (Tex. Crim. App. 2009). If a defendant wants to withdraw the written waiver, then he has the burden to show an absence of adverse consequences, namely, that the re-instatement of the jury trial will not interfere with the orderly administration of the business of the court, or result in unnecessary delay or inconvenience of the witnesses, or prejudice the State. Here, Appellant contends that no inconvenience for the court or State was ever placed in the record. Although those principles were discussed briefly by the Court and by the parties at the hearing on the Motion for New Trial, nothing was ever placed in the record that would serve as the basis for those kinds of problems.

There are those considerations. Additionally, Appellant contends that there was a fundamental infirmity in executing the waiver of his right to a jury trial. As shown

above, an essential, crucial fact upon which he made such a waiver was not, in fact, true. Both parties, at the time the waiver was executed, believed that that case was heading toward a plea founded upon evidence that would support the allegations and proof of possession of a controlled substance in an amount over one gram but less than four grams (*see*, Brief, above, hearing on March 7, pp. 3-4; and evidence at hearing on Motion for New Trial, pp. 13-14).

One would call this a mutual mistake in civil law, and the same should hold true in criminal proceedings. One may look to the decision of our Texas Supreme Court for guidance: *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990), where, writing for a unanimous court on whether a party could cancel a personal injury release, Doggett, J., stated: "Pursuant to the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be avoided." (citation omitted). Justice Dogget goes on to say, "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent…but rather solely by objective circumstances surrounding the execution of the release, such as the knowledge of the parties at the time of signing…the amount of consideration paid, the extent of negotiations…the haste or lack thereof in obtaining the release" *Id.*

Here, there is no doubt that both parties had **no knowledge** on February 14, 2014, that the lab report would fail to support a plea to a felony drug charge. To the

contrary, both the State and Appellant entered into the agreement based upon a crucial factual assumption that was not, in fact, true. The **"consideration"** involved was a guilty plea, a waiver of jury trial, and acceptance of six years incarceration – pretty stout consideration in terms of life, liberty and waiver of constitutional rights. Moreover, it would appear from all evidence in the record that the agreement was reached after **negotiations** of the parties that failed to discover that fundamental mistake of fact.

One can also observe that there was breakdown in information upon which a reasonable person would have based a decision. No reasonable person would have decided to plead guilty to an offense and take six years incarceration if, in fact, the evidence/proof was lacking upon which to sustain a conviction.

It might be argued that Appellant waived his right to a jury trial as to the felon in possession of a firearm separately from the waiver of jury trial in the PCS case, that because they were different cases, it was too late to go back and reverse the waiver, that the trial court expressly told Appellant that he was waiving his jury trial right as to each offenses.  One problem with that argument is that the ignorance of the facts permeated the entire proceedings, not just the PSC case. The agreement on February 14 was that the felon in possession of a firearm case was going to be dismissed; Appellant had no reason to think he would ever go to trial on that allegation. An additional weakness of that argument is that the two cases were entwined: neither case

was being addressed without the other; they were interrelated by express design of both parties, State and Appellant.

This is somewhat analogous to the problem of pleading guilty: it must be done knowingly, intelligently, and voluntarily. *See, McGrew v. State*, 286 S.W.3d 387, 391 (Tex. App. – Corpus Christi 2008, no pet.). Appellant, therefore, additionally contends that the waiver of jury trial was involuntary because, in signing the waiver as a part of the plea agreement, Appellant had every reason to believe that the felon in possession of a firearm case would go away, that is would be dismissed in consideration for his plea to the other felony of PCS.

For all of those reasons, Appellant would urge this Honorable Court to reverse the trial court's determination of the waiver of right to jury trial, reverse the conviction, and remand for a new trial.

## SECOND ISSUE, RESTATED

**THE VIDEO OF THE CUSTODIAL INTERROGATION AND ITS EVIDENCE SHOULD HAVE BEEN SUPPRESSED, SINCE IT WAS BASED UPON AN ILLEGAL INDUCEMENT BY AGENTS OF THE STATE, AND, CONSEQUENTLY, MAKING IT INVOLUNTARY**

FACTS

The circumstances of the custodial interrogation are set forth above (Brief, p. 12). Appellant stated that, prior to beginning the actual custodial interview as seen on the video, Officer Chitwood told him that, if he would admit to the offense of

possession of the firearms, he, Chitwood, would help him. Then, according to Appellant, the officers began to record the session, gave Miranda warnings, and took the statement, where Appellant makes incriminating statements, essentially admitting to the offense, keeping his part of the bargain reached off camera, i.e., helping the officers so that they would "help" him.

Counsel for Appellant argued that the statement given by Appellant was the product of promises from law enforcement – the "type of promise that would induce someone to give a false confession" and that the confession was, therefore, not voluntary. (5 RR 67-68).

LAW AND ANALYSIS

The accused has the Fifth Amendment right not to make a statement that is self-incriminating. *Miranda v. Arizona*, 384 U.S. 436 (1966), establishes that there must be some warnings given to the accused before he makes such a self-incriminating statement during custodial interrogation. This constitutional principal finds its State statutory counterpart in Art. 38.22, Sec. 3(a) TEX. CODE CRIM. PRO., which sets out certain requirements that must be followed in order for a video custodial statement to be admissible in Texas courts, in essence that prior to the statement but during the recording that the Miranda warning be administered and that the accused knowingly, intelligently, and voluntarily waives the rights.

At trial Appellant's counsel objected to the video statement as having been the product of wrongful inducement. No evidence is in the record that contradicts Appellant's version of how there was a *quid pro quo* offered by Officer Chitwood before the video interview began. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996) outlined the following analysis for involuntariness: (1) a failure to comply with Art. 38.22, TEX. CODE CRIM. PRO.; (2) failure to comply with the dictates of *Miranda*; or (3) the statement was taken in violation of due process or due course of the law because the statement was not freely given due to coercion, force, or improper influence. Furthermore, it has been stated that to induce a confession, a promise must be (1) positive, (2) made or sanctioned by someone in authority and (3) of such an influential nature that a defendant would speak untruthfully. *Creager v. State*, 952 S.W.2d 852, 854 (Tex. Crim. App. 1997)

Here the statement is suspect under three out of three of those standards seen in both *Wolfe* and *Creager*. First: Officer Chitwood failed to comply with Art. 38.22, TEX. CODE CRIM. PRO., because he began the interrogation prior to administering the warnings: he offered the *quid pro quo* to Appellant "off the record," a clear violation of the statute. Additionally, time after time throughout the interview Officer Chitwood held out the prospect that Appellant could "work off" his charges as Appellant and Chitwood discuss details of drug dealers. [1]Second, Officer Chitwood

---

[1] References are to the times seen in State's Exhibit No. 33 (by hour and minute): 10:45, 10:46

failed to comply with *Miranda* because his promises went beyond the allowable conduct under *Miranda* and the promises certainly came from someone clothed with authority. Third, there was an improper influence by holding out the *quid pro quo* of "you help us and we'll help you," such that the inducements of "working off your charges" and a probation would be likely to induce a false confession.

When one looks at the totality of the circumstances (*see, Creager v. State*, 952 S.W.2d at 856), it is obvious that this inducement had substance, because several times during the interview Appellant supplied names to Officer Chitwood, hoping thereby that his "help" would gain a reciprocal "help" from Chitwood. The inducement had all of the hallmarks of impropriety: the balance of power was weighted very much in favor of Chitwood: he held all the cards, whereas Appellant was locked up, looking at what he believed were multiple felonies and a prison term; next, Chitwood held out hope to Appellant that he could assist him in lowering his bond and even a probation if he "helped" Chitwood (though that hope was mislaid,

(bond); 10:50 (knowledge of persons selling drugs); 10:47 (location of person selling drugs); 10:48 (Appellant naming names); 10:48 (Chitwood telling Appellant "you have to do the work"); 10:49-51 (Appellant describes a drug dealer in detail, his physical attributes, where he lives, that he uses a motorcycle and sell crystal meth and how he sells it and for what price; 11:05-08 (describes another drug dealer and her whereabouts and other information); 11:08-09 )Chitwood says: "we can help you out…but it's going to be your doing the work"); 11:09 (Chitwood tells Appellant he can be "doing so many people to work off your cases"); 11:10 (Chitwood tells Appellant: " we can work off" the charges against him and "get probation"); 11:11-12 (Chitwood tells Appellant there are two ways to go about this, including Appellant making a video of a buy and then being available to testify in court); 11:18 (Appellant tells Chitwood, "I am ready to work" and can use his mother's vehicle); 11:19 (Chitwood asks Appellant if he can get more guns); 11:20 (Chitwood promises Appellant he will get his bond lowered the following Monday; he also tells Appellant that "you've been honest" – referring back to the initial premise upon which the conversation began, that if appellant was honest with him, that Chitwood would "help" him).

since Chitwood never intended to assist in lowering the bond, and said as much on the witness stand -- see 3 RR 45, lines 14-16); finally, even though Appellant did provide information to Chitwood, Chitwood characterized it as of little value, although he never said that to Appellant during the interview. So all the winning cards were in Chitwood's hand in making improper inducements to Appellant, whose position could not have been much weaker.

The trial court reversibly erred in admitting the video confession into evidence. Analyzed under Rule 44. 2(a), TEX. R. APP. PRO., it cannot be said beyond a reasonable doubt that the error did not contribute to Appellant's conviction. *Holmes v. State,* 323 S.W.3d 163 (Tex. Crim. App. 2010). The video statement was used in the direct evidence from Officer Chitwood (5 RR 41-42); when the State cross-examined Appellant, the statements on the video were emphasized (5 RR 59-60); when the State made summation, it referred to the video (5 RR 67). It would be difficult to separate the proof of the State's case from its use of the video at strategic parts of the trial. There was harmful, reversible, error. The cause should be reversed and remanded for a new trial.

**THIRD ISSUE, RESTATED**

**THE TRIAL COURT REVERSIBLY ERRED IN FINDING THE SEARCH WARRANT VALID AND, THEREBY, ADMITTING THE EVIDENCE TAKEN DURING THE SEARCH**

FACTS

Officer Chitwood described how he used information from a confidential informant to draft his affidavit for a search warrant (5 RR 19-20). State's Exhibit 2 was the affidavit, admitted over the objections of Appellant's counsel (5 RR 20-21). The affidavit recites several things that, upon trial, were not true. First, it states that Appellant has "a reputation for illegal narcotics trafficking" and that Appellant has two arrests, where he was "charged with drug law offenses." The record shows otherwise: the only evidence of a prior conviction for contraband was the Class B Misdemeanor conviction for possession of marihuana found in State's Exhibit 38. Hardly the stuff of narcotics trafficking or multiple arrests. Next, the Affidavit states that based upon the information from the confidential informant ("CI") and his own experience, Chitwood "believes it is reasonable to expect to find other paraphernalia and evidence of Methamphetamine trafficking," listing an array of the sorts of things he "reasonably expected to find": scales, containers, records of sales, unpackaged contraband, money, and devices for using the drugs. None of that was found. Though he postulates the reliability of his CI, and that the information came within 72 hours, the search does not bear this out. Again, the affidavit sets out the CI's observation of

Methamphetamine, in small clear baggies and also in a large bag, but he/she does not indicate (nor does Chitwood state in his affidavit) where that contraband would be found in the house. Then there is the phrasing of just how Officer Chitwood had relied in the past upon the CI: "CI has acted as an informant for Affiant in the past, giving Affiant **information concerning illegal activity** on numerous occasions. On each occasion, CI's information has proved to be true and has led to seizures of illegal controlled substances…" (emphasis supplied). Note that Chitwood does not say what sort of illegal activity the CI observed and reported. Was it drugs? Was it theft? Was it forgery? Assault? Murder? Robbery? Burglary? It might have been any number of "illegal activities," but the illegal activity of possessing narcotics is **not** stated. That the results in the past were the capture of narcotics proves nothing about the nature of the "illegal activity" reported by the CI. Was the seizure of contraband serendipitous? Accidental? Unforeseen? In spite of other information given? Happenstance? Luck? Good fortune? A roll of the dice? Taking the odd over the even? Betting on red instead of black? That does not establish reliability; it only establishes that Chitwood seized narcotics. How is there a cause and effect? Why would the CI be reliable in this instance? Does one simply get to make an intuitive leap within the four corners of the document? Hardly. One must, therefore, question the reliability of the CI as well as the accuracy of his/her information.

LAW AND ANALYSIS

Underlying any analysis of the validity of a search warrant and its affidavit is the Fourth Amendment and its State counterpart, Art. 1, Section 9, TEX. CONST. *See also*, Art. 1.06, TEX. CODE CRIM. PRO., Art. 18.01, TEX. CODE CRIM. PROC., Art. 18.04(2), TEX.CODE CRIM. PRO. *See, Rios v. State*, 901 S.W.2d 704, 706-07 (Tex. App. – San Antonio 1995, no pet.). *Blake v. State*, 125 S.W.3d 717 (Tex. App. – Houston [1ˢᵗ Dist.] 2003 no pet.) gives a concise recitation of case law and principles concerning the analysis of suppression questions on appeal: reviewed under an abuse of discretion, the four corners doctrine, probable cause, reliability of the informant. There it was stated that the reliability of the informant should be based upon the assertion that "that the informant had given information in the past regarding narcotics trafficking which had proved correct" *Id*., at 726.

Is that what occurred in the instant case? No. As set out above, in several important respects the informant was unreliable and without foundation, and the basis for reliance lacked sufficient detail for that reliance. The affidavit only says that the CI gave information concerning illegal activity on numerous occasions. That is all. It does not say that the CI "had given information in the past regarding narcotics trafficking which had proved correct." That is a distinction with a difference. It does not meet the standard of reliability. The Trial Court abused its discretion and erred in failing to suppress the evidence taken from the illegal search in violation of the Fourth

Amendment and Art. 1, Sec. 9, TEX. CONST. See also, art. 38.23, TEX. CODE CRIM. PRO. The conviction should be reversed and the cause remanded to the trial court.

**FOURTH ISSUE, RESTATED**

> **SEC. 46.04(a)(1), TEX. PENAL CODE, AS APPLIED TO APPELLANT IS UNCONSTITUTIONAL, SINCE, UNDER THE SECOND AMENDMENT, U.S. CONST., IT IS A CONSTITUTIONALLY PROTECTED RIGHT FOR AN INDIVIDUAL TO POSSESS A FIREARM IN HIS HOME FOR THE PURPOSES OF SELF-DEFENSE**

FACTS

Upon the search of his bedroom in Appellant's home, law enforcement seized four pistols of varying calibers, and it was based upon that seizure that Appellant was charged and convicted of being a felon is possession of a firearm under the indictment (CR, 2). At trial, counsel for Appellant argued to the Court that there was a constitutional impediment to conviction, based upon his client's Second Amendment rights, interpreted in recent decisions by the United States Supreme Court (5 RR 35).

LAW AND ANALYSIS

Appellant was indicted and convicted under Sec. 46.04(a)(1), TEX. PENAL CODE. At the time of his arrest he was in his own home and in his own bedroom. The pistols were found in his closet (5 RR 27-28; 30-34). *McDonald v. Chicago*, 561 U.S. 742 (2010) sets out the principle that, under the Second Amendment, and under Fourteenth Amendment Due Process considerations, a person in his own home has a

right to possess a firearm in that place for defensive purposes. *McDonald v. City of Chicago*, 561 U.S. at 791. That decision followed the Second Amendment decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

There is a distinction between a facial challenge to a statute's constitutionality and an "as-applied" challenge. It has been characterized as follows: "A facial challenge claims that a statute, by its terms, always operates unconstitutional. *United States v. Salerno*, 481 U.S. 739, 745 (1987). *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex. 1995). By contrast, an as-applied challenge asserts that a statute, while generally constitutional, operates unconstitutionally as to the claimant because of her particular circumstances. *City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 240 (Tex. 2001); *Garcia*, 893 S.W.2d at 518 n. 16." *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 702 (Tex. 2014). *See also, Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983), holding that "…in passing on the constitutionality of a statute, we begin with the presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily; and a mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable" (citation omitted).

Appellant's challenge to Sec. 46.04(a)(1), TEX. PENAL CODE, is an "as-applied" challenge under the particular facts and circumstances of his case.

Appellant does not contend that the statute, no matter what the facts of any case, runs afoul of the Second Amendment. Rather, he tailors his argument to say that, in the confines of his own home, Appellant, as any other American citizen, has the constitutionally protected right to keep and bear arms for his own protection. This was expressed very pointedly during Appellant's testimony, where several times he showed concern for his safety and the safety of his family, owing to the nefarious individuals who inhabited his neighborhood, who would tend to take a dim view of his actions as an informant for law enforcement. *See,* Appellant's testimony at 5 RR 54-55, 56, 60. The statute was codified in 1973/1974, well before these Supreme Court decisions; even its most recent amendments in 2009 (adding subsections f and g) precede the *McDonald v. City of Chicago* decision. *See,* legislative history in Vernon's Texas Codes Annotated, Penal Code, Vol. 6, at p. 84. *See also,* in general, the Texas Legislative Reference Library online at www.lrl.tx.us.

Moreover, one should note that the statute does not categorically deny a felon the right to possess a forearm. Section 46.04(a)(2), TEX. PENAL CODE, states that it is an offense for a felon to possess a firearm "…after the period described in Subdivision (1) at any location **other than the premises at which the person lives**" (emphasis supplied). It has also been held that the Legislature has not excluded the justification of necessity as a defense to this offense. *See, Vasquez v. State,* 830 S.W.2d 948, 950 (Tex. Crim. App. 1992). So, the legislature finds no crime in

possessing a firearm in one's home after the period of five years set in Subsection (a)(1). Appellant contends that the time limitation should now yield to the decision in *McDonald v. City of Chicago.* The proof in this case shows that about two and one-half years (almost 30 months) had elapsed since Appellant was released from parole supervision,[2] more than a reasonable span of time to see whether or not he would commit some sort of act of violence with a firearm. Moreover, if it is a defense for a felon to possess a firearm under the doctrine of necessity, surely in light of our Supreme Court's recent holdings, it is now a defense to the offense to possess the firearm in one's home for self-defense.

In light of these qualifications to the offense, it would be reasonable to conclude that, given the recent extension of the Second Amendment right to citizens to possess a firearm in their own homes for self-defense, the statute as applied to Appellant is unconstitutional. For those reasons, the conviction should be reversed and the cause remanded with a judgment of acquittal.

---

[2] He was released from parole supervision on April 1, 2011 (5 RR 16). The offense in the case at bar was alleged to have occurred on or about September 18, 2013 (CR 2).

# PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, CINQUE ROSS, APPELLANT, prays that, upon review and consideration of the facts, the reasoning, the arguments, and authorities herein, this Honorable Sixth Court of Appeals will reverse the conviction of Appellant and will remand the cause with a judgment of acquittal or, alternatively, remand the cause for a new trial, and for such other and further relief to which Appellant is justly entitled.

Respectfully submitted,

LAW OFFICES OF LEW DUNN
201 E. Methvin, Suite 102
P. O. Box 2226
Longview, TX 75606
Texas State Bar No. 06244600
Email: dunn@texramp.net
Tel: 903-757-6711
Fax: 903-757-6712

/S/ Hough-Lewis "Lew" Dunn
Hough-Lewis "Lew" Dunn

**CERTIFICATE OF DELIVERY**

I hereby certify that a true and correct copy of the above and foregoing Brief for Appellant was sent by first class mail and/or hand-delivered and/or sent electronically to the office of Hon. Zan Colson Brown, Assistant Gregg County Criminal District Attorney, Gregg County Courthouse, 101 E. Methvin, Suite 333, Longview, Texas on this 11th day of March, 2015.

/S/ Hough-Lewis "Lew" Dunn
Hough-Lewis "Lew" Dunn


**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document complies with Rule 9, TEX. R. APP. PROC., regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 8,130 words.

/S/ Hough-Lewis "Lew" Dunn
Hough-Lewis "Lew" Dunn